643 A.2d 505

Steven A. **LEVENSON**

v.

**G.E. CAPITAL MORTGAGE SERVICES, INC.**

**No. 1498, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

June 30, 1994.

Certiorari Granted Nov. 16, 1994.

David P. Sutton, argued (William Hoffman, on the brief) Baltimore, for appellant.

Lawrence J. Gebhardt, argued (Mark M. Dumler and Gebhardt & Smith, on the brief) Baltimore, for appellee.

Argued before WILNER, C.J., and ALPERT and WENNER, JJ.

WENNER, Judge.

In a case of first impression, we are asked to determine the effect of the doctrine of equitable subrogation on the relative rights of a judgment lienholder and a lender who refinanced an existing first lien without knowledge of the intervening judgment liens, when the new loan exceeded the balance of the refinanced loan, and the refinancing lender's right to equitable subrogation was not asserted until after it had foreclosed on the new loan.

On appeal, appellant, Steven A. Levenson (Levenson), the judgment lienholder, asks:

Whether the Circuit Court erroneously upheld appellee's equitable subrogation claim asserted for the first time after a foreclosure sale, thereby precluding the satisfaction of appellant's prior judgment liens consistent with the full payment of appellee's derivative subrogation entitlements.

We will rephrase and address Levenson's question in two parts:

I.   Whether the circuit court erred in determining that appellee, G.E. Capital Mortgage Services, Inc. (G.E.) was entitled to be equitably subrogated to the rights of the prior first deed of trust holder.

II. If equitable subrogation was appropriate, whether the circuit court erred in determining that foreclosure of the G.E. deed of trust extinguished Levenson's liens.

Although the trial court did not abuse its discretion in granting appellee, G.E. Capital Mortgage Services, Inc. (G.E.), equitable subrogation, it erred in holding that G.E.'s foreclosure of its deed of trust extinguished Levenson's liens.

## Facts

On April 15, 1980, an undivided one-half interest in Baltimore County property, known as 11 Gatespring Court, Cockeysville, Maryland (the property), was conveyed to Miguel Better and Yolanda Better, his wife, and the remaining undivided one-half interest in the property was conveyed to Jaime Salcedo and Yolanda Salcedo, his wife. The Salcedos were the daughter and son-in-law of the Betters. On the same day, the Betters and the Salcedos executed a deed of trust in favor of First Federal Savings and Loan Association of Annapolis (First Federal), in the amount of $60,000.

On April 23, 1986, Jaime and Yolanda Salcedo conveyed an undivided one-half interest in the property to Yolanda Salcedo, individually. On March 21, 1990, Miguel and Yolanda Better conveyed an undivided one-half interest in the property to their daughter. By that time, Yolanda Salcedo had been divorced and remarried, and the Betters' deed identified her as "Y. Maria Benson (also known as Yolanda M. Benson)." The younger Yolanda was now the sole owner of the property. From this point on, we shall refer to her as Yolanda.

On April 6, 1990, Yolanda, using the name Yolanda M. Benson, refinanced the property with Travelers Mortgages Services, Inc. (Travelers). The settlement sheet from the loan closing shows that, of the loan amount of $131,200, $7,707.97 was applied to settlement charges, the First Federal loan balance of $56,283.14 was paid off, and Yolanda received the remaining $67,208.89. G.E. is Travelers successor in interest, and we shall refer to the Travelers' loan as the G.E. loan and the G.E. deed of trust.

On June 23, 1988, three judgments, totalling $108,422.99, were entered by confession in the Circuit Court for Baltimore County against Yolanda M. Better, 11 Gatespring Court, Cockeysville, MD 21030, in favor of Levenson. Levenson's judgments were not discovered during an examination of the title to the property performed just prior to the G.E. loan.

By early 1991, Yolanda had defaulted on the G.E. loan and G.E. began foreclosure proceedings. Beginning February 14, 1991, foreclosure sale of Yolanda's property was advertised in The Jeffersonian, a Towson newspaper of general circulation. The advertisement announced:

> By virtue of the power and authority contained in a Deed of Trust from YOLANDA M. BENSON, dated APRIL 6, 1990, and recorded in Liber 8470, Folio 795 among the land records of the COUNTY OF BALTIMORE, in the original principal balance of $131,200.00 with an interest rate of 10.0% upon default and request for sale, the undersigned trustees will offer for sale at public auction at the front of the Courthouse for the COUNTY OF BALTIMORE, 401 BOSLEY AVENUE, TOWSON, MARYLAND ON FRIDAY, MARCH 1, 1991 AT 3:06 P.M. all that property described in said Deed of Trust....

Several days prior to the sale, an attorney representing Levenson notified G.E. of the Levenson judgments.[1] Although G.E. promptly filed a claim against its title insurance, it proceeded to foreclosure rather than wait for the title insurance company to determine the priority status of the Levenson judgments. On the day of sale, Levenson's attorney reiterated to G.E. his belief that the Levenson judgments were superior liens to the G.E. deed of trust. Due to its uncertainty regarding the status of Levenson's judgment liens, G.E. bid $45,000 for the property, instead of the customary lender's bid of the full amount of its indebtedness. Levenson did not bid, and the property was sold to G.E. for the amount of its bid.

---

1. We presume this contact was prompted by the lack of any mention of the Levenson judgments in the advertisement of sale.

On April 10, 1991, Levenson filed a petition in the Circuit Court for Baltimore County for allowance of a priority claim in G.E.'s foreclosure action against Yolanda. Levenson's petition asserted that the liens of its judgments were superior to the G.E. deed of trust and asked the court to direct that the proceeds of the sale be paid to him as partial satisfaction of his judgments and, to the extent the judgments remained unsatisfied, that their lien continue to attach to the property.

G.E. responded, asserting that, as its deed of trust secured refinancing of the First Federal loan, and it intended its deed of trust to be a first priority lien on Yolanda's property, under the doctrine of equitable subrogation it was entitled to hold first position as to the $56,283.14 used to satisfy the First Federal deed of trust. Thus, G.E. contended, its foreclosure discharged all subordinate liens, including Levenson's judgment liens. Under G.E.'s theory, Levenson would be entitled only to the proceeds of the foreclosure sale in excess of the amounts secured by G.E.'s first priority deed of trust, and, as the foreclosure sale fetched only $45,000, there were no such proceeds.

After thoroughly reviewing the application of the doctrine of equitable subrogation, the trial court concluded that it was applicable and that neither laches, waiver, nor estoppel precluded G.E. from asserting that it was entitled to equitable subrogation. The trial court then held that "Levenson's liens are, in effect, extinguished since the amount the property sold for at the foreclosure sale was $45,000," thus adopting G.E.'s position concerning the effect of equitable subrogation.

*Discussion*

I.

On July 13, 1993, the day that Levenson noted this appeal, he also filed a motion to vacate the order ratifying the foreclosure sale, which had been entered on April 25, 1991. By order of August 11, 1993, a different judge of the trial court granted Levenson's motion, vacated the order ratifying the foreclosure sale, and ordered receipt of Levenson's Excep-

tions to Sale as if timely filed. G.E. cross-appealed the trial court's order of August 11.

Although, in the absence of a stay required by law or obtained from an appellate court, a trial court retains the authority to exercise its fundamental jurisdiction during the pendency of an appeal, *State v. Peterson*, 315 Md. 73, 81, 553 A.2d 672 (1989) (quoting *Pulley v. State*, 287 Md. 406, 419, 412 A.2d 1244 (1980)), it is not always proper for the trial court to exercise that jurisdiction. *Id.*, 315 Md. at 81, 82 n. 3, 553 A.2d 672. We believe that this is such a case.

The very right of Levenson to file exceptions to the ratification of sale depends upon our determination of this appeal, as "[o]rdinarily, the holder of a prior mortgage has no standing in court to file exceptions to the ratification of a sale made under a junior mortgage; because, generally, such a sale is made subject to the prior mortgage and does not affect the rights of the prior mortgagee." *Plaza Corp. v. Alban Tractor Co.*, 219 Md. 570, 576–77, 151 A.2d 170 (1958); *Scott & Wimbrow, Inc. v. Calwell*, 31 Md.App. 1, 5, 354 A.2d 463 (1976). For Levenson both to proceed with this appeal and proceed before the trial court as a subordinate lien-holder could potentially lead to inconsistent results. The trial court should have stayed its consideration of Levenson's motion to vacate during the pendency of this appeal. As our resolution of the remaining issues in this appeal will deprive Levenson of standing to file exceptions, we shall reverse rather than vacate the trial court's order of August 11 vacating ratification of the sale.

## II.

We next note a point raised by G.E. in a footnote to its brief and at oral argument. G.E. draws our attention to the fact that the Levenson judgments were confessed against Yolanda M. Better, a name not used to identify Yolanda in any of the records of title. In *Frederick Ward Associates v. Venture, Inc.*, 99 Md.App. 251, 636 A.2d 496 (1994), we held that a judgment in the name of Chris Walker did not constitute a lien against property held by Walker as John C. Walker. In

so holding, we said that "[n]otice will be found ... where the facts and circumstances are such as would lead a reasonably careful title searcher to conclude either that the name of the judgment debtor and the name of the property owner designate the same person or that further inquiry is required to ascertain this fact." *Id.* at 257–58, 636 A.2d 496. Levenson's judgments were confessed against Yolanda M. Better, residing at the address of the property, on June 23, 1988. On that date, by virtue of the deeds of April 15, 1980 and April 23, 1986, an undivided one-half interest in the property was vested in Miguel Better and Yolanda Better, his wife, and the remaining undivided one-half interest was vested in Yolanda Salcedo. Hence, at that time, Levenson's judgments would have appeared to involve Mrs. Better.

Although, because Miguel and Yolanda Better held title to the property as tenants by the entirety, a judgment against Mrs. Better would not have attached to the property prior to the Betters transferring their interest to Yolanda by deed of March 21, 1990, *see State v. Friedman,* 283 Md. 701, 705, 393 A.2d 1356 (1978), that deed identified Yolanda as the Better's daughter and disclosed that she had divorced and remarried between 1986 and 1990. Whether this information should have placed a reasonably careful title examiner on inquiry notice that the judgment debtor was Yolanda M. Better Salcedo Benson rather than her mother is not before us, however, because at no time during the proceedings in the trial court did G.E. contend that Levenson's judgments did not constitute valid liens against the property. G.E. has therefore waived the issue, and we will assume, without deciding, that the Levenson judgments constituted liens against the property at the time of the G.E. loan. Maryland Rule 8–131(a); *County Council of Prince George's County v. Offen,* 334 Md. 499, 508–10, 639 A.2d 1070 (1994).

### III.

We turn next to whether the trial court erred in holding that G.E. was equitably subrogated to the rights contained in the First Federal deed of trust. The Court of

Appeals reviewed the doctrine of equitable subrogation in *Bachmann v. Glazer*, 316 Md. 405, 412–13, 559 A.2d 365 (1989). Resting upon the Court's equitable powers, the doctrine of equitable subrogation is a legal fiction under which an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of the third person, with the third person succeeding to the rights of the initial creditor in relation to the debt. *Id.* at 412, 559 A.2d 365.

*Bennett v. Westfall*, 186 Md. 148, 46 A.2d 358 (1946), established the operation of the doctrine of equitable subrogation in the context of mortgage priority. On June 13, 1944, Hunter and Ethel Shinholt executed a second mortgage to Frank Westfall for $773.60, due October 16, 1944. On August 30, 1944, Frank Bennett obtained a judgment for $1000 against the Shinholts. In consideration for extending their debt for another year, the Shinholts executed a new mortgage in favor of Westfall for $1000 on October 16, 1944. Unaware of the Bennett judgment, Westfall released the June 13 mortgage on recording the October 16 mortgage. Upon learning of the Bennett judgment, Westfall filed a bill in equity seeking restoration of his prior lien. The trial court restored Westfall's prior lien, declaring release of the June 13 mortgage to be a mistake in fact and null and void, and declaring the October 16 mortgage to be null and void.

On appeal, Bennett contended that there was no mistake, only Westfall's carelessness in not examining the property records. Westfall contended that he had no intention of replacing a senior lien with a junior lien and would not have accepted the October 16 mortgage had he known of Bennett's lien. Westfall claimed that this matter was a mistake that the trial court had equitable power to correct. Agreeing with Westfall, the Court of Appeals affirmed the decision of the trial court.

Several principles emerge from our review of *Bennett*. First, the lienholder seeking equitable subrogation must have taken the later lien without knowledge of the intervening lien and have intended the later lien to be of the same priority

as the lien it replaced. *Bennett,* 186 Md. at 155, 46 A.2d 358. Second, the negligence *vel non* of the lienholder requesting equitable subrogation in not discovering the intervening lien is not relevant, unless the intervening lienholder can show detrimental reliance on that negligence. *Id.* at 154, 46 A.2d 358. Finally, the doctrine as applied in a situation such as this derives in large part from the principle that the intervening lienholder should not be unjustly enriched by the mistake of the refinancing lienholder. *Id.* at 156, 46 A.2d 358.

Although the precise issue has never been addressed by Maryland appellate courts, the weight of authority extends the application of the doctrine of equitable subrogation to situations in which the initial and refinancing lenders are not the same, provided the refinancing lender's money is intended to be used, and is used, to eliminate a specific encumbrance, and the refinancing lender intended "to get as security for his loan either the land free and clear of the encumbrance or else the benefit of the encumbrance itself" rather than rely upon the general credit of the mortgagor. 4 American Law of Property § 16.149 at 349 (1952). Thus, one who "advances money to discharge a prior lien in reliance upon getting a first mortgage, or one as good as that which was paid off, is entitled to subrogation to the prior lien as against the holder of an intervening lien of which he was ignorant," George E. Osborne, Mortgages § 282 at 571 (2d ed. 1970), provided that the intervening lienholder is not prejudiced by the subrogation. Grant S. Nelson & Dale A. Whitman, Real Estate Finance Law § 10.6 at 14 (Practitioner Treatise 3d ed. 1993). *See also* 4 American Law of Property, § 16.150; Robert Kratovil & Raymond J. Werner, Modern Mortgage Law and Practice § 31.01 (2d ed. 1981); 5 Herbert T. Tiffany, The Law of Real Property § 1507 at 570–73 (3d ed. 1939); 5 John N. Pomeroy, A Treatise on Equity Jurisprudence §§ 1211–1212 (5th ed. 1941); 73 Am.Jur.2d, *Subrogation* §§ 103–105 (1974); 83 C.J.S., *Subrogation* § 39(b) (1953). We believe that such an extension is appropriate in view of modern lending practices, and we hold that the trial court did not abuse its discretion in holding that G.E. was entitled to be equitably subrogated to

the First Federal lien.[2]  We shall now examine the effect of granting such subrogation under the circumstances of this case.

### IV.

A subrogated party "stands in the shoes of the one whose claim has been discharged by his performance and succeeds to all of the rights, priorities, liens and securities of the former obligee," Osborne, *supra*, § 277 at 561, *but no more.  Government Employees Insurance Co. v. Group Hospitalization Medical Services*, 322 Md. 645, 650, 589 A.2d 464 (1991).  Thus, a refinancing lender is entitled to be equitably subrogated to the rights of the prior lender only to the extent of its payment in satisfaction of the prior lien.  73 Am.Jur.2d, *supra*, §§ 106, 116.  If the refinancing lender were to be given rights or security greater than that possessed by the prior lienholder at the time of satisfaction, one primary justification for the application of the doctrine of equitable subrogation, that of preventing the unjust enrichment of the intervening lienholder, would be destroyed, because the intervening lienholder would be placed in a worse position after subrogation than before payment and release of the prior lien.

### A.

The situation in the case *sub judice* has two aspects that are issues of first impression in Maryland.  The first is the treatment of a refinancing loan of a greater amount than the prior loan.  This issue did not arise in *Bennett*, for although the later mortgage placed by Westfall was greater than the first, the excess was found to be usurious and uncollectible at law or in equity.  *Bennett*, 186 Md. at 154, 46 A.2d 358.  Nor have we found much guidance in decisions of other jurisdic-

---

**2.**  In so holding, however, we note that the rights of a third party bona fide purchaser for value are not involved.

tions, or in secondary authority.[3]

■ We believe, however, that the solution is obvious. While it would be unfair to penalize the refinancing lender by denying equitable subrogation on the sole basis that the later loan is greater than the prior, neither would it conform with the "principles of natural justice, fairness, and good conscience" underlying the doctrine of equitable subrogation, *Osborne, supra,* § 277 at 562, to allow the refinancing lender to piggyback additional sums loaned onto the amount used to payoff the prior lien and elevate the priority of the entire refinancing loan. Consequently, we hold that in such a situation the refinancing lien is to be treated as having two components. The first component of the refinancing lien is equal to the amount paid by the refinancing lender in satisfac-

---

3. The only treatise to mention this issue assumes it will not arise when an institutional lender is involved:

> A point of some difficulty, not discussed with frequency, unfortunately, involves the case where the new mortgage secures a greater debt than was secured by the earlier mortgage. · It is equitable, arguably, to subject an intervening lien to a debt no greater than that existing when he acquired his lien. That portion of the new mortgage undoubtedly should have priority. Normally this suffices to extinguish the intervening lien even though the balance of the new mortgage might technically be subject and subordinate to the intervening lien.

> Since the situation commonly calling for subrogation is one where a refinancing of a first mortgage is pitted against an intervening lien, it is obvious that where institutional mortgages are involved, the standard title search will reveal the situation....

Kratovil & Werner, *supra,* § 31.01.

*See also Chicago Title Insurance Co. v. Lawrence Investments, Inc.,* 782 S.W.2d 332, 335 (Ct.App.Tex.1989). In *Chicago Title,* the funds from a refinancing loan were used to pay off a tax lien and a prior loan, and to add improvements to the property. When an intervening mortgage holder began foreclosure proceedings, the refinancing lender foreclosed simultaneously. The Court of Appeals of Texas held that the refinancing lender was entitled to be subrogated to the prior loan, but emphasized that a refinancing lender's "leapfrog" priority applies only to the extent that the refinancing lender's funds were used actually to discharge a prior lien. The Texas court, however, failed to apply this limitation to the case before it when it next summarily found that the previously held foreclosure applied to the subrogated lien and extinguished the intervening mortgage. In this respect, we believe the Texas decision to be flawed.

tion of the prior lien, and is equitably subrogated to all of the rights and security of the prior lien. We will call this component the "subrogated lien." The second component of the refinancing lien is comprised of its remaining balance. This component, which we will call the "remainder lien," continues to be secured by the refinancing lien and retains its relative position junior to the intervening lien.

Thus, following equitable subrogation, G.E. is subrogated to the First Federal deed of trust in the amount of $56,283.14, and to that extent occupies first lien position with all of the rights of the First Federal deed of trust. The balance of G.E.'s loan remains secured by the G.E. deed of trust and occupies third position behind the subrogated lien and Levenson's judgment liens.

### B.

The second unique issue with which we are here presented is not as neatly disposed of, and results in large part from G.E.'s insistence in moving forward with its foreclosure sale when the status of its lien was in question. We must now determine the proper treatment of a claim for equitable subrogation that is asserted after foreclosure of the refinancing lien. In effect, the trial court held that once the equitable subrogation was judicially established, G.E.'s foreclosure attached to the subrogated lien rather than the remainder lien. In this respect, the trial court erred.

We shall begin by reviewing the legal effect and operation of a foreclosure sale. The purchaser at a foreclosure sale "buys only the interest of the mortgagor, or the parties to the cause." *Baltimore Federal Savings & Loan Association v. Eareckson,* 221 Md. 527, 531, 158 A.2d 121 (1960) (citing *Hewisler v. Nickum,* 38 Md. 270, 278 (1873)); *see also* Maryland Code (1974, 1988 Repl.Vol.) § 7–105(a) of the Real Property Article ("A sale . . . operates to pass all the title which the borrower had in the property at the time of the recording of the mortgage or deed of trust."). When a first mortgage is foreclosed, the surplus of the proceeds of sale,

after payment of the foreclosing mortgagee's claim and expenses, is distributed equitably among those claiming an interest in the equity of redemption. Maryland Rule W75(a); *see Metcalfe v. Canyon,* 318 Md. 565, 569, 569 A.2d 669 (1990). Regardless of whether there are sufficient surplus proceeds available to be applied to any junior lien, all junior liens are extinguished upon the foreclosure of a more senior lien. *Cf. Island Financial, Inc. v. Ballman,* 92 Md.App. 125, 131, 607 A.2d 76 (1992) (ratification of the foreclosure sale of a first mortgage has the ultimate effect of nullifying second mortgage holder's interest in the property).

On the other hand, foreclosure of a second or more junior lien is subject to the debt secured by a senior lien unless the holder of the senior lien is made a party, or assents to a sale free of the senior debt. *Tolzman v. Gwynn,* 267 Md. 96, 99, 296 A.2d 594 (1972); *Eareckson,* 221 Md. at 529–30, 158 A.2d 121. In such a situation, the net proceeds of the sale will be applied to reduce the debt of the mortgage foreclosed upon; the holder of the senior mortgage, whose lien remains attached to the property after foreclosure, is not entitled to any of the proceeds of the sale. *Id.* at 530, 158 A.2d 121.

Entitlement to equitable subrogation is an inchoate right, and, until judicially established, the subrogated lien does not exist. 73 Am.Jur.2d, § 135; 83 C.J.S., § 63; *see Smith v. Lawler,* 93 Md.App. 540, 549–50, 613 A.2d 459 (1992), *cert. denied,* 329 Md. 110, 617 A.2d 1055 (1993) (equitable liens must be established "either in a suit to enforce the claimed lien or in some other appropriate proceeding providing notice and hearing"). At the time of its foreclosure sale, G.E. had not asked the trial court, either in the *foreclosure proceeding* or through a separate action, to establish its right to be equitably subrogated to the First Federal deed of trust. G.E. advertised that its foreclosure sale would be conducted pursuant only to the power and authority contained in its deed of trust, making no representation at any time that it intended to proceed upon authority of the First Federal deed of trust. Because at the time of the foreclosure sale G.E. had not

established its subrogated lien, the entire amount of its lien was subordinate to Levenson's judgment liens, and thus the sale was necessarily subject to those judgment liens.

In order to foreclose its equitably subrogated lien, the proper course for G.E. to have followed would have been to institute a declaratory action, or petition in the foreclosure proceeding, to establish an equitably subrogated lien, then advertise and foreclose as subrogee to the First Federal deed of trust.[4] In following its present course of action, G.E. has attempted to eliminate Levenson's intervening liens in a manner not consistent with the equitable principles establishing G.E.'s partial priority. In sum, we hold that the foreclosure was of G.E.'s deed of trust and that the foreclosure sale was subject to G.E.'s equitable subrogation to the First Federal deed of trust and to Levenson's liens. We also hold that G.E.'s subrogated lien does not merge with its ownership of the property as purchaser at the foreclosure sale. Thus, the $45,000 in foreclosure sale proceeds should be distributed to G.E. to be applied to the remainder lien. G.E. holds title to the property subject to its subrogated lien and to Levenson's liens, while the remainder lien and any other junior liens are extinguished by the foreclosure sale.

**ORDER VACATING RATIFICATION OF SALE REVERSED.**

**OTHERWISE, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

---

4. A subrogated lender must foreclose under the authority of the prior lender's lien instrument, because that instrument contains the security and the rights it obtains through subrogation. In this respect, equitable subrogation operates as though the prior lien is revived and assigned to the refinancing lender. *See* Pomeroy, *supra*.