IAN R. ANDERSON ET AL. *v.* ASSOCIATED
PROFESSORS OF LOYOLA COLLEGE
IN THE CITY OF BALTIMORE

[No. 981, September Term, 1977.]

*Decided May 11, 1978.*

346

The cause was argued before GILBERT, C. J., and MOYLAN and MELVIN, JJ.

*Donald N. Rothman* and *Nancy E. Paige,* with whom were *Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Benjamin L. Brown, City Solicitor of Baltimore City,* and *John N. Spector, Assistant City Solicitor,* on the brief, for appellants.

*Thomas N. Biddison, Jr.,* with whom were *Gallagher, Evelius & Jones* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

According to Jim Oigan,[1] "Zoning is that branch of the law wherein everybody is an expert on 'the best use' of the other fellow's property." Zoning first appeared in this country around the turn of the century and was an obvious attempt to bring order to chaotic urban sprawl. *Euclid v. Ambler Realty Co.,* 272 U. S. 365, 386-87, 47 S. Ct. 114, 117-18, 71 L. Ed. 303, 310 (1926). History will have to decide just how well we succeeded in our endeavor.

The case now before us commenced with the crossing of words by the Associated Professors of Loyola College in the City of Baltimore (Loyola) and a number of neighbors affected by Loyola's attempt to expand. The expansion took the form of acquiring two (2) residences located on Millbrook

---

1. *See* Van Schaik v. Van Schaik, 35 Md. App. 19, 20, n. 1, 369 A. 2d 133, 134, n. 1 (1977).

Road, immediately across the street from the college campus proper. Loyola moved its president into 4601 Millbrook Road. The house is used as a residence and office of the president. 4603 Millbrook Road has become administrative offices, with adjacent parking. Understandably upset over what appellants believe to be an unlawful intrusion into the R-1 (Single-Family Residence District) neighborhood with a deleterious effect on property values,[2] some residents registered their protest to the Board of Municipal and Zoning Appeals (Board). The hearing involving the president's residence-office was on March 30, 1976. The matter of the administrative offices was heard by the Board on January 25, 1977. In baseball terms, Loyola and the protestants "split the series." Loyola won as to the president's residence-office, but the protestants carried the day on the administrative offices. Neither side was happy with half a loaf, and both appealed to the Baltimore City Court. Once there, the cases were consolidated and heard. Loyola won the "doubleheader." The City Court decided both appeals in Loyola's favor, thereby affirming the Board with respect to 4601 Millbrook Road, the president's house-office, and reversing the Board as to 4603 Millbrook Road, the administrative offices.

The protestants[3] now urge us to reverse the City Court in both matters, thus restoring the properties to use as residences only. Appellants challenge the rulings of the trial court with a three-pronged assault. We, however, view the jugular of the case to be whether the use to which 4601 and 4603 Millbrook Road are being put by Loyola is within the scope of the uses permitted in an R-1 District.

The Zoning Ordinance of Baltimore City, signed into law by then Mayor Thomas A. D'Alesandro, III, on April 20, 1971, provides in pertinent part:

---

2. "Property is the fruit of labor: property is desirable; it is a positive good." Abraham Lincoln (1809-1865).

3. The protestants consist of Dr. Ian R. Anderson, Helen M. Anderson, his wife, Leo J. Bowers, Robert L. Hickey, Dr. W. Richard Ferguson and Jean H. Ferguson, his wife, Dr. Pien-Chien Huang, Theodore Richard, Paul P. Swett, Jr., and Catherine Swett, his wife, and the Mayor and City Council of Baltimore.

"4.1 R-1 SINGLE-FAMILY RESIDENCE DISTRICT

4.1-1 Use Regulations

a. *Permitted Uses*

1. Single-family detached dwellings

. . .

3. Non-profit or publicly owned educational and cultural institutions, as follows:

(a) Elementary schools

(b) Junior and senior high schools

(c) Junior colleges, *colleges and universities* — but not including business colleges or trade schools.

(d) Libraries and art galleries.

(e) Museums, aquariums, and planetariums."

(Emphasis supplied.)

Off-street parking is a permitted conditional use only when authorized by ordinance of the Mayor and City Council. The Zoning Ordinance of Baltimore City, Ord. § 4.1-1d3 (1971) provides in pertinent part:

"d. Notwithstanding other provisions of this ordinance, the following uses as conditional uses shall require authorization by ordinance of the Mayor and City Council subject to the requirements and provisions of Section 11.0-6d:

. . .

3. Open off-street parking areas, other than accessory, for the parking of four or more automobiles — provided, no charge or fee, shall be made for such parking."

Section 4.1-1a3 makes crystaline that colleges, such as Loyola, are permitted within an R-1 District. What is not so clear is what is meant by "colleges"? Does the term mean the campus upon which the educational facilities themselves are located, or does it have some broader meaning? Appellants

argue that "the Baltimore City Court erroneously held that since the properties are owned by Loyola ... and used in connection with the operation of the college, the office use should be permitted because ... colleges ... are permitted." Appellants contend that the acceptance of the City Court's reasoning could "virtually eliminate zoning restraints on the use of residential property owned by educational institutions." That result, appellants maintain, violates the principle that "the zoning ordinance is concerned with the use of property and not with ownership thereof nor with the purposes of the owners or occupants." *Mayor and City Council v. Poe,* 224 Md. 428, 433, 168 A. 2d 193, 195 (1961); *Boulevard Scrap Co. v. Mayor and City Council,* 213 Md. 6, 10, 130 A. 2d 743, 745 (1957). The argument advanced by appellants overlooks that it is the *use* by Loyola, not the *ownership,* of the property that the City Court authorized. Indeed, the ordinance does not require that a college own the property in order to use it for educational purposes. Nothing prohibits a college from renting the premises upon which the facility is operated. *Poe* and *Boulevard Scrap* would be applicable if the factual pattern of the case were reversed and Loyola, as the owner of the property, rented it to another for a use not sanctioned in an R-1 District. Under those circumstances, the ownership would be of no import as we would look to the use.

The ordinance does not mandate that the physical properties of a school, college, or university be located upon contiguous lands. The omission of such a restriction seems to us to indicate the City Council's recognition of the impracticality of that limitation. It would, *e.g.,* create chaos as to the University of Maryland, Baltimore City, where the various educational buildings, while in proximity to one another, are for the most part separated by thoroughfares. The same is true of the University of Baltimore. That school's property is spread over a greater distance than that of the University of Maryland, Baltimore City.

A college is more than its classrooms, laboratories, and study halls. It is an undertaking that involves, in today's world, athletic fields, gymnasiums, libraries, faculty and

student lounges, school newspaper offices, administrative offices, chapels, and ofttimes faculty residences. A residence for the president of the institution is not unusual.

We have examined a number of authorities, but we have found no case directly on point. In *Yancey v. Heafner,* 268 N. C. 263, 150 S.E.2d 440 (1966), however, the Supreme Court of North Carolina held that the erection of a concrete, 4,000 seat, lighted athletic field was permitted in a single-family residential zone in which schools and colleges were allowed. The court reasoned that the day of the " 'little red school house' is a thing of the past." *Id.* at 264, 150 S.E.2d at 442.

The Supreme Court of Nebraska, in *Doane College v. County of Saline,* 173 Neb. 8, 112 N.W.2d 248 (1961), upheld a lower court's finding that the college president's residence, "located immediately across the street from the campus," *Id.* at 11, 112 N.W.2d at 250, and "overlook[ing] the campus," *Id.,* was a part of the college and not taxable. In *Doane,* as in the instant case, the living quarters were supplied to the president as his residence. He entertained there and used the house for the reception of new faculty members, visitors, trustees and their families. It was also used for meetings and conferences. The court said that, "[t]he primary or dominant use of this property is for educational purposes. . . ." *Id.* at 12, 112 N.W.2d at 250. A similar holding is found in *Kansas Wesleyan Univ. v. Board of Comm'rs of the County of Saline,* 120 Kan. 496, 243 P. 1055 (1926).

While *Doane* dealt with the taxability, *vel non,* of the president's off-campus residence, the rationale is persuasive. We think it unmistakable that the primary purpose of 4601 Millbrook Road is educational, a definite part of the college program, and a proper use in an R-1 District.[4] *See Western Theological Seminary v. City of Evanston,* 325 Ill. 511, 156 N. E. 778 (1927).

---

4. Several cases have held that off-campus "dormitories" belonging to the school and used by its students are an integral part of a college or school, having an educational purpose and thus permissible in a residential zone. Schueller v. Board of Adjustment of the City of Dubuque, 250 Iowa 706, 95 N.W.2d 731 (1959); Yale University v. New Haven, 71 Conn. 316, 42 A. 87 (1899).

Administrative offices are also an essential part of the educational process. Without them, it is doubtful that a college could long exist. We believe that the use by Loyola of 4603 Millbrook Road as administrative offices for the college is in keeping with the zoning ordinance.

The "primary or dominant use" of the Millbrook Road properties by Loyola is for education purposes. As such, they are indubitably permitted uses in an R-1 District.

> "[A]n ordinance which provides for the construction of a school [or college] in a residence zone would encompass the right to erect [or convert] buildings, equipment and the plant which ordinarily form a part of the ... school [or college]." *State v. Laurel Crest Academy,* 2 Conn. Cir. 294, 198 A. 2d 229, 232 (Conn. Cir. Ct. 1963).

If, as appellants allege, the sanctioning of Loyola's use of the Millbrook properties is tantamount to the virtual elimination of zoning restraints upon schools, colleges, and universities, the remedy does not lie with the courts. Rather, redress should be sought from the legislative body that brought forth the exception in the first instance. It is up to the City Council of Baltimore, if they share apellants' fears, to curtail the expansion of educational use into R-1 Districts.

There yet remains the question of the parking lot adjacent to 4603 Millbrook Road. The testimony before the Board was to the effect that there were spaces for somewhere in the twenty (20) to forty (40) vehicle range. The City Court's order implicitly approves the use of the parking lot but states no reason why it so determined. Other than the single sentence relative to 4603 Millbrook Road, that, "[i]t also contains a parking area," the opinion of the City Court is silent in regard to that parking area.

We think that in view of The Zoning Ordinance of Baltimore City, Ord. § 4.1-1d (1971), the court may have been without jurisdiction to permit the parking area in the R-1 Single-Family Residence District.

The City Council is the proper body to determine whether an off-street parking area is permissible at 4603 Millbrook

Road unless the parking is deemed to be an accessory use as that term is defined in The Zoning Ordinance of Baltimore City, Ord. § 13.0-2 1 (1971). We shall remand the matter to the City Court for remand to the Board for a finding of whether the parking area constitutes an accessory use.

> *Judgment affirmed as to 4601 Millbrook Road.*
> *Costs to be paid by appellants.*
> *Judgment affirmed in part and reversed and remanded in part as to 4603 Millbrook Road.*
> *Costs to be divided equally between appellants and appellees.*